4-17-06-06 Jason Gehrig, Works at the Workers' Compensation Commission www.LibertyMutual.com Jim Ackerman, Petitioner My name is Jim Ackerman. As I think you know, I represent Petitioner in this case. The commission in this case applied the wrong standard to this case. It required that Petitioner prove how long he did everything in his job, the duration of it, all that hierarchy, and Darling specifically cite to that language and say it's inappropriate for a commission to require that. Can I ask you a special question? Isn't this case properly analyzed under whether or not this was a compensable neutral risk? No, it's a repetitive trauma case. Repetitive trauma case? It's two. We filed two applications. One's repetitive trauma and one was for sitting all that time. If you're analyzing the one, it would be you look at the risk issues. When you're doing repetitive trauma, I don't think you do. What was the repetitive action? He was sitting there, four-flexed, twisted, with his knees up around his ears for years, sitting in that position. That's the position he was in for that time. If you look at it from a risk standpoint, he is an employee doing his job at the time. Unless you throw out the science of ergonomics, this is a risk associated with his job. I think you have to analyze it that way. I've argued this is a de novo case. That's because every single expert that testified said this is related. It's a manifest way to the evidence case. If it's a manifest way to the evidence case, the evidence is overwhelming that this is related. Every single expert said it's related. We had two ergonomic experts testify about not only his position is bad, but why that affects the spine and how people don't appreciate the risk they're taking when they sit in unusual positions, four-flexed, twisted, knees around his ears, et cetera. We had two orthopedic surgeons testify that sitting in that position for long periods of time repetitively is one of the worst things you could possibly do for your back. Dr. Payne said it is only second to carrying sod or brick laying. The risk is very significant. He took that risk for his employer. He sat at his desk every day, and especially on leads day, for his employer to further his employer's interest by making sales. He was on a commission, but to do that, that's what he did. So he ended up taking a significant risk that, quite frankly, he did not appreciate at the time to further his employer's interest. And so that is why it is a compensable claim. What is the nature of the risk that you see that you would characterize? Well, he was sitting four-flexed, twisted, in a position where he really couldn't move it around much unless he knew that it was a risk. And he is a real big guy. And so the one expert said he couldn't fit under the desk. One person said he had his knees around his ears. So what is the nature of the risk? The experts say that if you sit like that, four-flexed, that you put great, incredible weight and pressure on the spine, and that causes the disc to herniate. Van Fleet said that. Payne said that. We had Erin Steinecker, excuse me, Alicia Davis-Barth come in, who is an ergonomic specialist, and explained the science of how sitting four-flexed and twisted impacts the spine in ways that people don't really appreciate. And so they take the risk not appreciating the fact that they are taking the risk. Now, our case law has done an analytic kind of matrix or an analytic approach of classifying the type of risk. So where would you put it? It is a risk that he took for his employer. So it's a compensable risk. Well, that's a conclusion. Analysis. Is this a mutual risk? No. Personal risk? Is it a risk uniquely associated with his employment? I think it's a risk associated with employment. I mean, that's kind of where we started. Yeah, I get that. And so if you look at it as associated with employment, which I think he had to. Most people would say that, you know, sitting in a chair. It's not. General. No, I think that's right. Generally speaking, you guys were all sitting in chairs. I suppose you could be standing if you wish, and people can normally stand up when they wish. But he was required, especially on leads day, to sit in that chair and be on the computer all day while he made leads. And if he didn't, it affected his compensation. So that makes it, to me, an employment-related risk. Now, if you analyze it as a neutral risk, in other words, he's got to be gentle. Let's slow down for a second. Okay. Was there anything wrong with the chair? Any testimony there was anything wrong with this ergonomic chair? It's not an ergonomic chair. That was one of the problems with it. Two. Did they give him a chair? No. Well, they gave him a chair. He put it in his office. And he complained about it. And Liberty Mutual requires ergonomic assessments because they do appreciate the risk. But they didn't do one for him. They didn't send anybody out anyway. And so the defect, if you will, with the chair is that – Wait a minute. Why did they replace the hydraulic up and down on the chair? Because it wasn't functioning up to his back. You just told me they didn't send anybody out to fix it. They didn't send an ergonomics – anybody out to do an ergonomics assessment. Oh, but they did send someone to fix the complaint he made about the chair. Correct. But they didn't send anybody to do an ergonomic assessment that they require. And you ask about the nature of the chair. The nature of the chair is it was too small, and it forced him to sit in a twisted manner. Now, if he would have had a chair that fit him, that wouldn't have been an issue. So that's the issue with it. So you say they were required to. What is – who are they, and what's the requirement? The employer had a requirement that they do an ergonomic assessment for each person's desk. That's what the testimony was. Was it recognition of the law as opposed to counsel? Implicit recognition that there is a risk to the employment by the employee? I think so. And a requirement that part of their job or that their entire job is to be sitting and working? It is. And I think, you know, not only is it an implicit acknowledgement of that, this is a science, you know, and there are people who do nothing but ergonomics assessments because it's important how you sit. And just because an employee doesn't figure that out and gets hurt doesn't mean they didn't take a risk for their work. And so I suppose the law could say, well, all that stuff about ergonomics, forget about it. Right? We'll just blame the victim. We'll just say the employee doesn't know what they're doing and they sat in the wrong position. But that's not the right way to approach this. The science is clear that sitting in the wrong position causes injury. And this guy did that for his work not just that day, but since 2006. I do argue the employee recognizes that. They did recognize it. Okay. By their policy. Also, in addition to the repetitive trauma, you also argued an alternative theory of recovery that the claimant suffered an acute injury on August 29, 2013. Correct. Can you elaborate on that argument based on what? Based on the fact that there was an MRI in May. I think it was May 26th. At any rate, he sat there. He said at the trial he felt bad. He started feeling his back hurt him as the day progressed. And when he tried to get up, he couldn't get up. And he had to call his wife. Well, what happened, though? You've alleged a traumatic injury on August 29th. What happened on August 29th, 2013? His back got tremendously – his pain levels skyrocketed. Your theory was he hurt his back when he got up from a chair to get something from a printer. No. Exactly what he testified to. The doctor testified. Dr. Payne testified. What did he testify to? He said he tried to get up and he couldn't get up. I mean, he had lots of pain. Dr. Payne said that the reason he couldn't get up was because he herniated this while he was sitting. And when he tried to get up, he noticed that he was having the pain. He herniated it that day while he was sitting or was part of your repetitive trauma theory? Well, I think kind of both. Well, it's not both. It's one or the other. It's either a repetitive trauma injury or it's an acute issue. I filed two applications because I figured – We understand that. But the question is we've got to rule on both of them, as the commission did. I understand. And they're consolidated for purposes of this appeal. And I think you can rule either way that it was that he herniated it sitting there. There's an MRI 12 days later that shows a much bigger herniation. That's not a coincidence. But who testified that it happened because he was sitting that day? Dr. Payne. And what did he say? He said that he believes that he was sitting at the chair, the disc herniated, and he didn't realize that it herniated until he stood up. And that's what Dr. Payne said. I want to take you to something else. Your opponent has suggested we should strike this brief. Yeah. What do you say? You know, I don't know how many briefs I've filed with this court, but I've filed a lot. And this is the first time I've ever had anybody criticize a brief because I didn't cite enough times. I tried to cite when I thought it was appropriate. You didn't cite any page references when you were first in medical testimony, leaving us the job to go scouring the record to find it. I'm on page 6 of your brief. All of Payne's testimonies. I think that's – And the chiropractor, Payne, if you go to page 8, it's exactly the same thing. No page reference to what Payne testified to. Bottom of the page, you've got your client's testimony and emergency room intake notes, no page references. I'm at a loss to understand what you contend in this brief is the issue in the case, but I can certainly tell you that your table of contents and points in authority at the beginning of the brief don't match up to the pages in the brief. I noticed that when I was preparing for this. I think what happened was we had a document and the secretary set up the page numbers. And when she did that, she put the statement of facts in front of it and then we ended up with problems. And I apologize. What about the issues in the case? What are the issues in the case? Well, I think – Where do you see the issues at? Because they're certainly not in the brief. The manifest way to the evidence is in the brief. No, it's not. You said de novo. Well, I said de novo, and if the court doesn't look at that as de novo – It's not an issue. That's a standard of review. What are the issues? Well, they're not as compensable, I suppose. Well, then it would be the issue in every case. So people might as well not write issues. Well, the case is – I mean, I argued it is both repetitive trauma and that it is a single incident. And I argued both of those in there. And I said that, you know, I argued manifest weight and I argued that evidence is overwhelming. So let's go back to the acute injury claim. Yeah. So the incident occurred upon an attempt to arise from a seating position at work. Am I correct? Well, Dr. Payne said he was sitting there and he noticed it when he got up. That's just what I said. Okay. Okay. And so what do you have as evidence that that activity created – or the activity he was engaged in created this acute incident? Well, he complained about it the next day to his employer. Yeah, go ahead. And then 12 days later – and he goes to the emergency room three days later and then he has an MRI 12 days later that shows a herniated disc. You know, he said after that he could not return to work. He could barely stand for quite a bit of time. I mean, his pain level skyrocketed. There's no other way to put it. He had a surgery within 30 days of that. And the doctor said he was ready to admit him to the hospital for pain control. Okay. Where do we have the testimony or evidence that that's a work-related – In Dr. Payne? Work-related event or work-related causation? Are you talking about Dr. Payne's position? I don't know. You tell me. Well, Dr. Payne says that on December 26th, that's C990. I cite to the brief C990. Dr. Payne testifies that it's the worst thing that could happen, 988, 989. He says that what he predisposes it went from here, C974. He says a disc with a tear, one ass on a cross, went from a middle-aged disc to a big herniation, C973. Now, but what relates it back to the August 29th date is what he's asking. That's when his pain level skyrocketed. And after that, he couldn't go back to work. But does the fact that pain level skyrocketed, does that in and of itself establish the traumatic injury occurred on that date? Well, yeah, I think it does. I mean, how else do you explain that he has a herniated disc three and a half months after he didn't, and his pain skyrocketed all of a sudden? Right? I mean, the second MRI is three and a half months after this happened, the second MRI. You'll have time to reply. Thank you. You'll have five minutes to reply. Thank you. Your Honors, Mr. Jackman, Mr. Garrett, and may it please the Court. My name is Matthew Rakusek. I am here on behalf of Liberty Mutual Insurance, petitioner's employer, and I am here to ask that you affirm and adopt the Commission's finding that the petitioner failed to prove a compensable accident under the Illinois Workers' Compensation Act. I think the Justice's questions on the direct argument is very telling in this matter. This is a manifest weight of the evidence case. The question involved in this case is whether or not the activity of sitting at work creates a compensable risk of work injury. And it does not. Sitting, except in rather extreme circumstances, has always been considered a neutral risk shared by the general public. Well, he's not arguing that merely sitting at a desk is a risk. He alleged a repetitive activity, trauma caused by this chair that he was getting in and out of. So what do you have to say about that? The physical therapist who examined the chair following the work injury testified that it's a normal chair with no obvious defects. All the doctors in question, Dr. Payne, during his deposition testimony, testified that this chair was no different than sitting off the toilet or sitting on a couch. Same with Ms. Davis-Barth, the physical therapist who testified live for the Commission. So the chair itself wasn't. But what about, I don't think anybody sits on the toilet how many hours a day? I would hope not. I'm sure there's something else. No, I mean, you're talking about the chair. But, Your Honor, that would then change this to an issue of a question of where anybody who sits in a chair all day for work now has a compensable risk of a work injury. No, I mean, his point is a little finer than that. He was saying that it was the nature of the chair, not that he was sitting on a chair itself. He didn't make that argument. The nature of this particular chair and the position he was required to be in every day caused the work injury. Was there any testimony offered by anyone that there was a problem with this chair specifically? The petitioner testified to our ongoing problem with the chair. And while he absolutely requested information from the employer or tried to get the chair repaired in 2007, that's shown by e-mails, there are no documentation of any complaints after 2007 about any additional problems with the chair. So there's evidence in the record that suggests that the ergonomic conditions of the claimant's work environment did not cause or contribute to cause his condition of ill-being. Is that accurate? I'm sorry, can you repeat that? Is there evidence in the record establishing that the ergonomic condition claimed by a claimant did not exist and or did not contribute to cause his condition of ill-being? With respect, yes, there is. But in the form of testimony from both Dr. Payne and Dr. Van Fleet... That's evidence, right? I'm sorry? That's evidence? Yes. Okay, so there is evidence. I think the confusion here in this case has to go back with what was actually reported by the petitioner as his cause of his incident at the time of his injury. Dr. Payne, who saw the petitioner about a week after the accident, wrote in his medical record that the petitioner had pain when he was... after he stood up from a sitting position. Sure, true. Mr. Ackerman clearly indicates, and it's evidence from Dr. Payne's deposition testimony, that Dr. DePayne does comment that the ergonomic condition could contribute. But when you look at my cause examination, I asked Dr. Payne, what did the petitioner actually report to you? And at that point, Dr. Payne says, no, that's correct. What he told me is he had pain after moving to a standing position. This is the same history reported by Dr. Van Fleet, the independent medical examiner. Dr. Van Fleet, in his independent medical examination, reports that the petitioner stood after sitting and had the immediate onset of back pain. Well, what does this have to do with anything? I don't think anybody's arguing this. There's a herniated disc. Do you agree that there is? Oh, absolutely. Okay, and do you agree that herniated discs produce pain? Absolutely. And that the experience of the pain may occur when there's a physical movement? Do you agree with that? Sure. Okay, fine. So let's put that off to the side. What's the issue here as to whether there's a compensable claim there? The question before this court on appellate review is whether there is sufficient evidence to support the commission's decision that the petitioner failed to prove by a preponderance that he had a compensable specific or a discreet trauma event or a repetitive trauma. Pain in your own Section 12 examiner testifies to a causal link, Van Fleet. But the commission chose to find them not credible on the connection. Clearly pain testified there was a link between disc herniation and sitting, he said. And so I think there is a link there with the seating at work and his back problems. He later testified that the manner in which he was sitting in his chair was a bad ergonomic position and was a factor in the fusion. Van Fleet said, based upon his description, it would appear when asked, it's difficult to determine if the plaintiff's plain lumbar disc prolapsed as a result of sitting in his chair. Then he says, based upon his description, it would appear so. However, the gentleman has had longstanding difficulties that are, in my opinion, not entirely related to the work base but related more towards his home environment and his morbid obesity. He is in a greater likelihood, in my estimation, of sustaining an injury to the disc by attempting to referee in a soccer game than sitting at work. In order to find the way they found, the commission had to discount the opinions of Van Fleet in pain. And what was that based on? It was based on the contemporaneous medical records as evidenced by the court's decision in Shell Oil that the petitioner had an acute onset of pain as he moved to a standing position. That is when he felt the pain. There is nothing in any of the contemporaneous medical records to suggest he was having a gradual onset of pain as he was sitting there. So you're saying, that's where I'm having a lot of, So you're saying that the ordinary daily activity of just arising from a chair, having been in a seated position, was what led to this? Yes, Your Honor. And it's not work related? Correct. That is a mutual risk shared by everybody in the general public, both Dr. Van Fleet and Dr. Payne indicated in this petition. You're 100% correct as to the acute injury. There's no question. He can't win on that. He simply can't. It's a mutual risk. And there's no evidence that it was anything other than standing up. But let's get to the repetitive trauma problem. Okay. Because that's an entirely different issue. Well, what the commission said in their decision is that the petitioner failed to meet his burden of proof to prove that his herniation was causally related to his job duty. Counsel, I'll read directly from the commission's decision. It says, The commission does not consider proof of a bad ergonomic condition and a particular condition of ill-being is sufficient to prove a compensable accident. Is that an accurate statement? Yes. Is proof of a bad ergonomic condition insufficient as a matter of law to establish a compensable accident? Yes. Just because something could have caused an injury doesn't mean it actually caused the injury. And that is the case here. The commission was forced to weigh all the evidence, and they did not find. So they're not throwing out. Opposing counsel had an interesting observation of this is throwing out ergonomic science. So you're saying you're reading that as if they're not throwing out ergonomic science. Correct. Just that the proof was not established. Correct. And all the petitioner's testimony focused on what he called a lead day, which is the exception to the rule. It is a special day. It is not his typical work day. And the petitioner, as noted by both the arbitrator and the commission, provided no testimony to what he would be doing on his regular day at work. One out of 30. Does it matter? Okay. In other words, a lead day is something that occurs more than one time, I think. I believe they were monthly or quarterly, Your Honor. Okay. Not, but not. Well, I mean, now we're into what do you mean by repetitive? I mean, what's the time frame between an activity to make it not repetitive? You're saying it's too far, so it's a month? Well, Your Honor, that is something that could be. I do A, but I do it over a period of time? Yes, and I think that's a fact that would be considered by the commission. But once again, I think Ms. Davis-Barr's testimony is the most instructive on this issue. She says that the act of bending the spine and sitting for as little as 10 minutes is what causes this increased risk. So, again, we talked about has someone not sitting for eight hours on the toilet? It's not uncommon to sit for 10 minutes on the toilet. My dad refers to it as a reading room, Your Honor. People sit down for 10 minutes in their car all the time. They sit down for 10 minutes while they're eating a dinner. So if you're going to, the commission would have to consider all these different exposures that he has to this risk. I want to go back to my reference to the commission's decision and the categorical statement that it made that a proof of a bad ergonomic condition cannot lead to establishment of a compensable accident. So if you have a worker, a hypothetical worker, whose job it is, say, to stare at that light bulb or the light fixture directly above you for eight hours during the day, and over the course of a 40-hour work week, the spinal column is weakened to such an extent that he or she needs to have treatment. There's a herniated disc because of that. You're saying that the work conditions requiring that the employee stand and look directly above his or her head, that being a bad ergonomic position cannot lead to the conclusion that he or she has suffered a compensable accident? Absolutely not, Your Honor. That is absolutely a compensable accident as long as he's required to look up for the job duties. All right. But here, the question is, Your Honor, he is sitting down at a desk. This is a normal person-sized desk. This is not, you know, there is no, this is a desk he set up at home. It's his own desk in his own home office, which he testified he controls. The owner, you know, the company didn't set it up for him. Basically, your answer would be there's no proof in the record that that's a bad ergonomic condition? No, there is an ergonomic analysis that says he's in a bad ergonomic position. But that's just sitting at a desk in front of a computer, Your Honor. That is not. We're still trying to get to the concept, okay? I just want to get established here whether or not the commission erred as a matter of law in its analysis here by saying the commission does not consider proof of a bad ergonomic condition and a particular condition of ill-being is sufficient to prove a compensable accident.  I just heard you indicate that proof of a bad ergonomic position can lead to a compensable accident. Correct, but Your Honor is taking that statement out of context and not reading the rest of the paragraph. The commission goes on to state, because there was no evidence directly relating Petitioner's workstation to his herniation, a finding that his workstation was the cause of the herniation would necessarily be based on conjecture or speculation in which the commission. Go ahead. I was going to say the first question I asked you was what the record established here and whether or not that statement was supported by evidence in the record. I'm not sure that you actually answered that,  that there is no evidence directly relating the ergonomic seating to his herniation. Is that correct? Yes. Then we're at a manifest weight position here and that's how the case gets decided. And I agree with that 100%. Wait a minute, but that's not true. That simply isn't true. What isn't true? That there isn't any evidence in the record relating to the ergonomic position of his seating and his injury. Dr. Payne opined that the manner in which he was sitting in his chair was a, quote, bad ergonomic position and was a factor in the fusion. That was Payne's testimony. So don't say there was no evidence in the record. There was. The commission chose to find Payne not credible because there was no evidence in the record that Payne understood exactly how much time this man spent sitting compared to how much time he spent standing. If you read the decision in this case, this case was decided on a failure of proof after a determination that Payne was not credible. But there's evidence in the record. You can't say there's no evidence in the record that the ergonomic position didn't contribute to this injury. Payne gave it. He gave it twice. He once said, clearly before we had surgery he had a very large significant change in this radiation in the lumbar spine, so I think there is a link there with the seating at work and his back problem. That's Payne. Which should have been the focus of your argument as to why Payne can be discounted. I'm sorry. But, Your Honor, I'm sorry. My time is up? Yes, it is. No, keep going. Keep going, though. Okay. Consensus. But Payne's testimony cannot be considered without looking at his other testimony, that the actual onset of pain occurred after he moved from a sitting to a standing position. We're not here to give him compensation for pain. We're here to give him compensation for the condition of spinal ill-being, which may or may not have manifested itself with Payne immediately. Payne is not what we're giving him, the commission's giving him money for. The commission would give him money for the condition of ill-being. That's the back problem. Okay. But I would agree with your statement, Your Honor, but, however, I believe there is sufficient evidence in the record and that the commission was in its right to weigh the conflicting evidence and find that the petitioner failed to meet his burden of proof. And under the Manifest Ways and Standards, this Court should affirm the commission's decision. Thank you, Counsel. Counsel, you have five minutes to reply. Thank you, Your Honor. Now, I'm going to rock you back right back to the same issue. The commission found that you didn't introduce any evidence as to the amount of time this man was sitting in his chair, how frequently he sat in his chair, the manner in which he had to perform his work. The only thing that the testimony and evidence focused on is whether or not sitting in a chair and twisting could have caused the breakdown of the prospective structures in the spine over time, resulting in the discrimination. Petitioner also spent a lot of time talking about his workstation setup, but didn't spend much time providing evidence concerning his activities, such as the frequency, duration, and manner in which he performed his job. They turned around and said, you know, sitting in a chair is a neutral risk. Where is the evidence that this man was exposed to some risk to a greater degree than the general public? Alicia Davis-Barth testified that sitting for a long period absolutely has a communal effect on the spine. The effects of breaking down those structures tend to accumulate over time. When you sit in that position, static tissues tend to creep. How frequently did he sit in that position and what duration on a daily basis? His job description said he had to sit. Forget about his job description. I want to know how much time he did it. We didn't have testimony specifically as to how often he sat in his chair, but his job description says he did it. Counsel, that was the basis for the commission saying you failed in proof because you didn't. It's right here in their decision on page 18. The arbitrator finds the position failed to place into evidence any specific detailed information concerning his activities, including frequency and duration. That's why we have Fierke and Darling that say that that isn't a proper question for the courts, for the commission. It's not when you're talking about a neutral risk. It's one of the two things that has to be introduced. If you're talking about a neutral risk, you must establish for compensability either a qualitative or a quantitative distinction between that which the complainant is exposed to and that which the general public is exposed to. Cases are legion on that. So the question becomes, if you don't say how frequently he did it, how do we know it was more often than the general public would experience sitting down? Well, one, he was required to do it at least three to six hours by his job description, and that's what he did for a living as a salesman. But he never testified how often he did it. He was talking about Lee's day, about how he did that. Then we had him talk to his doctor, Dr. Payne, before the deposition in the length about how often he did that. Dr. Payne explained that that was part of the problem, and so did Alicia Davis Barth, who examined his seating position and talked about how she knows that that caused the problem. What is the testimony about Lee's day that came from your client? He said he sat there all day, didn't get up, and he said he started feeling some pain, feeling like he was sitting too long. We're talking back to neutral risk analysis. Quantitatively, what did he say? Qualitatively, because it could also be qualitative. I'm not sure I understand the question. No, I'm afraid not. You don't. So let's work at it. Neutral risk, qualitatively or quantitative, is what you need to be focusing on for compensability. Right. Higher than general risk, the general public. Correct. Right. And so he was required to sit in that position, and like I said, ergonomically, it's clear that sitting in that position for long periods of time causes that problem. He had to sit there all day that one day, and he had to sit there as part of his job, three to six hours a day is what the job description says, and he said he did that. The problem that we're having with you is what the job description says is not necessarily what he did. And where is the testimony in this record as to what he actually did? Well, Dr. Payne talks about that in his deposition. He said he had to sit there for long periods of time. He said he had to sit there for long periods of time, and he had to talk on the phone for long periods of time. We didn't say how many hours a day because it varied, and the law is pretty clear that you don't have to say how long you do it for every day because it can vary. It's not like he did it every day that he'd sit in the chair for three to six hours, but most days he would sit in the chair for three to six hours, and Lee's day he had to sit there all day every day in a bad or anomic position. I'm about out of time. You have expressed concern about my brief. I do want to apologize. I will be more careful about that. Okay. Thank you, counsel. Thank you both, counsel, for your arguments in this matter. We'll be taking our advisement for at this time.